This is case number 4090246, Norman v. Brandt. The appellant is Frederick Schlosser, URE. The appellee is Michael Powell. By the way, counsel, we request that you folks be here a half hour early because, as happens here, we can sometimes start sooner and without having to wait if we're moving ahead quickly. You're both here. I want to thank you on behalf of the court for that. This is the reason why we have that request in. Mr. Schlosser, you may proceed, sir. Justice Steinman, Justice Polk, Mr. Stafford, and may it please the court, I'm Fred Schlosser, and I'm here on behalf of Richard Norman individually and as personal representative of his son, David, who was paralyzed in the accident we'll be discussing today and subsequently died following the filing of a complaint in this matter. Did he pass away as a result of the injury sustained? The argument will be, if it gets to trial, that it was connected to the injuries he received in the accident. Yes, Judge. Standard Review is de novo. Motion for summary judgment filed by Sam Brandt was granted by the trial court. He found no legal duty owed to David Norman on behalf of Brandt. He also found that, well, he didn't get to the issue of no proximate cause as a matter of law that was argued at the trial court as well in light of his ruling on the fact that no duty existed. This case involves a two-car caravan involving six teenagers. Sam Brandt was driving the lead vehicle. Amanda Leggett was driving the following vehicle. The destination was Lake Bloomington where the teenagers had decided to go swimming at a relative of Sam Brandt's, I believe his uncle. This decision was made at the apartment of Jacob Martin's mother's house and it occurred on August 7, 2005. The undisputed facts and the reasonable inferences therefrom, which is the posture this case is in since the trial court granted a motion for summary judgment, are that Sam Brandt selected the route to the lake house, that he was the only one who knew where his uncle's house was, that Amanda Leggett in the following vehicle had no idea where it was, although she knew where the lake was, and that Brandt knew of the dangerous characteristics of the route he selected and of the dangerous and hazardous nature of speeding on that particular route. He knew it was a 55 mile per hour county highway. He knew that it was narrow for drivers going in opposite directions such that, in his own words, it was narrow to the extent you had to get over almost under the shoulder to avoid oncoming traffic. He knew that it contained hills. In fact, the hill where the accident site occurred was of such an incline or crest that he admitted that as he went over it, Amanda Leggett would not have been able to see his vehicle in a lead vehicle. He knew from experience that gravel was oftentimes strewn on the highway, presumably from cars having to get over as they were passing. And he knew that Amanda Leggett was an inexperienced driver, that she was only 16 years old, had only had her driver's license for a few months, and he knew that she was not comfortable going fast. In response from her, he commented to him, go slowly, in his agreement that he would do so. Now those are the facts and the reasonable inferences that can be taken from those facts. The nature of the roadway, consistent with Brad's description, was confirmed by the plaintiff's expert witness, Duane Owen, of Rule. And he analyzed the situation, determined that the road was 19 feet wide, and that the regulations for county roads of that nature were such that it should be 22 feet wide. It was three feet more narrow than is typical. He also determined that Amanda Leggett was going 70 to 75 miles per hour at the time she lost control of her vehicle, flipped it into an adjacent bean field. Now Amanda Leggett says that she was going 60 miles per hour, still above the speed limit, because she had some type of vehicle that portrayed the speed and speedometer onto the windshield. The passengers in Sam Brant's vehicle, Matt Drew, Brad Scott, estimated, as they looked in the rearview mirror and saw the car spinning, that the car would have left the roadway between 75 and 90. Granted, they're lay witnesses, but it's consistent with Mr. Rule's scientific analysis saying she left the roadway at 70 to 75 miles per hour. Now, the law on this thing, you know, speeding, is the tortious conduct that we'll be talking about today. But the law found at 11601A, I think it's important that speeding consists of more than just going above the speed limit of 55 miles per hour. That statute provides that no vehicle may be driven at a speed which is greater than reasonable and proper with regard to the traffic conditions and the use of the highway or endangers the safety of any person or property. And then it goes on to say at 601, the fact that the speed does not exceed the applicable speed limit does not relieve the driver from the duty to decrease speed when approaching a hill crest, when traveling upon a narrow roadway, and when special hazard exists with respect to conditions on the highway. Those are three conditions we have at the scene of the accident. We have individuals approaching a crest, we have individuals on a narrow county highway, and we have gravel on the highway. So not only should either vehicle not have been going 55 miles per hour, they should have decreased the speed at that particular point in the roadway. Now we're here to focus on Sam Brandt. Obviously Amanda Leggett was the driver of the vehicle in which David Norman was a passenger. And we're here to talk about what duty did he have to David Norman as the lead driver. And the touchstone of duty in general is whether public policy considerations, whether the plaintiff and defendant stood in such a relationship to one another that the law imposes a duty upon the defendant of reasonable conduct in favor of Mr. Norman. And so that's the general thing. Then we have an analytical framework to try and establish how to analyze this factual scenario to make a duty determination. And some of that framework is found in Restatement 2 of TORCH, specifically Section 876, which involves in-concert theory of liability, and subsections A and B of that particular section. In particular, A finds in-concert liability when the lead driver does a tortious act in common design with another. Or as an alternative, it can be found where Sam Brandt knows that the other's conduct, which would be Amanda Leggett, constitutes a breach of duty and gives substantial assistance to Ms. Leggett. And the comments go on about drag racing and how the driver of a non-contact vehicle can be liable in concert with an individual that's injured due to drag racing. Drag racing is the easy one. There's no question that that's in-concert liability. Here we don't have a drag race. You have two vehicles speeding in tandem. And that is what we're here today to discuss and whether the in-concert theory of liability should extend to Sam Brandt in the situation we have before us. Counsel, you're correct that the standard review is de novo on the granting of a motion for summary judgment. But at the same time, we have the analysis and remarks of Judge Harris before us, in which he reviewed the facts before him and made his assessment of what your argument was and his explanation as to why he was granting the motion. It looks like a very sound analysis to me. Where did he go wrong and why shouldn't we agree with what Judge Harris said? Where he went wrong, I believe, is while his inferences may be reasonable, I don't think there are competing reasonable inferences to be drawn more favorable to the plaintiff. For instance, I think he accepted the fact that Sam Brandt wasn't speeding. I don't think that is consistent with the reasonable inferences that are favorable to David Norman in this case. For instance, Amanda Leggett said in the mile to a mile and a half before she reached the crest that the gap between her and Sam Brandt's car did not increase or decrease, that they were following in tandem. Jacob Martin, her 15-year-old front seat passenger, testified similarly. He could not give an estimate of the speed, but he was clear that the distance between the two vehicles during that period of time remained constant. Well, I don't think he said any of his remarks in front of me. It's not so much that he said that it wasn't that Brandt wasn't speeding. What he said is it's undisputed that the only agreement between Brandt and Amanda was that Amanda would follow to the lake house. There's no evidence of a common design dispute. There's no evidence that Brandt and Amanda were racing or engaging in horseplay. No evidence that the group had to arrive by a time certain. These are three specific findings that the trial judge made. Was he wrong in any of those three? I don't think he was wrong in saying that people weren't in a hurry. I mean, those are conclusions from the record, but that does not support the further conclusion that they weren't speeding. Well, why is that? I don't know that he mentioned that, and I don't know. Let's assume he was speeding. Why would that matter? If he was speeding, with the knowledge in speeding, whether it's defined as going over the speed limit or failing to reduce speed with the crest and the hazards on the road, if Sam Brandt was speeding, in light of the other considerations, Amanda Leggett was going to a common destination all of the destinations today because she didn't know where she was going. She was going to be following him. She asked him to drive slowly. She wasn't comfortable driving due to the fact that she had only had a license for several months. In fact, she wasn't comfortable driving alone. That's why these two individuals who had all hopped into Sam Brandt's car came over to hers. So the fact that it's a reasonable inference, she was keeping pace with Sam Brandt, pursuant to the agreement to follow him, pursuant to the agreement that he would go slowly, and he violated that agreement. Well, this is what Judge Shura says. The only plan was for Amanda to follow Brandt to the lake house. That is not a plan under the Tortious Act. The only claim in the Tortious Act is Brandt's act of speeding, but there's no evidence that there was a plan to speed. Am I wrong in any of that? I don't think there was. I don't believe that there was a discussion, I'm going to speed. I think there was just the opposite. There was a plan to go slowly, and that the plan was he was going to set the pace, and by speeding, he committed the Tortious Act himself. By speeding, he also, in other considerations, she didn't know where she was going, she wasn't comfortable, and that his act of speeding was substantial assistance to her because he decided who was going to read with who, Sam decided who was going to go with who, Sam decided where they were going to go, Sam decided... How does any of that matter? Those last two things you just mentioned. Okay, that matters. How is that significant? Well, a good case, although it's from out of state, from Washington, is Powell v. Lee. That's where a dance troupe was going to a performance in another city. There was three vans driving. The lead van was driven by the dance troupe operator. He picked the point. He knew where they were going. He had the hotel reservations. He had set the schedule. He had told, I think it was his brothers, actually, that were following in the two trailing vans, and he knew where they were going. They did not have maps, the following vehicles. They could not read English, so that signage wasn't going to be helpful to them, and the court found, in that case, and under those circumstances, his act of speeding in light of his control of the itinerary of the trip supportive of in-concert viability, even though he was not involved in a contact vehicle. And I think that's what we have here is the relationship, which is the ultimate issue. Does Sam Brandt and David Norman stand in such a relationship that the court should impose a duty as a general proposition? The relationship is all bound with what the agreement was, what they had decided, where they were going, and how they decided to get there. So I believe there is a relationship between Sam and David Norman through Amanda Leggett and these decisions. Procedurally, this case appears to be a little bit strange because, according to the trial judge, he writes that Norman appears to have abandoned application of subparagraphs B and Z of Section 876 and instead asserts application of subparagraph A. But if I understand you correctly, on appeal, you're asserting both. That's correct. And if the court were to find waiver, obviously that's a limitation only on the parties and not upon the court. And we would ask that the court not find that issue to be waived. It was briefed fully in the briefs, both responded to by Mr. Brandt's attorney as well. And I think it's important to reach this issue because in concert liability, theory of liability, is a very gray area. It's a very murky area in the state of Illinois law now. So I think it's a matter of adding some meat to the analytical framework that we have here and some guidance to the trial courts in the future. The most recent case that we had was Wilson v. Wangler. And I know Justice Steinman, you're obviously well aware of that case, where it was on a pleading stage, 2619 or 615, however it was pled, but that was one where Justice Cook had concerns in his concurring opinion that, you know, the four case decision out of the fifth district kind of led, you know, but for liability. He had concerns about expanding the scope of duty to encompass but for liability. And I don't believe that's what we're doing here by allowing this to go back to the trial. Procedurally, you're also raising, if I understand you correctly, contention that Section 324A of the restatement applies to this case, but it seems to me you're raising that for the first time in the field. Raising that analytical framework, yes. Yes. I mean, the duty issue is before the court. But, yes, that was not argued at the trial court by trial. But as opposed to the other one, which was, as you pointed out, brief, discussed, whatever, this wasn't ever presented to the trial court at all, was it? That's correct. That analytical framework was not. The voluntary undertaking framework, again, goes back to what Sam Brandt agreed to do in light of the concerns expressed by Amanda Leggett. He agreed to go slowly. That was a voluntary undertaking pursuant to the analytical framework of Section 324 of the restatement. And I feel that that is also an additional basis or an additional analytical framework to impose a duty in this case upon Sam Brandt in favor of David Norman. And then we can go back to the traditional duty analysis, reasonable foreseeability of imposing a duty, the likelihood of injuries, slight magnitude of the burden. Of course, one of the problems, counsel, and I'm sure you understand it, is if we now address 324A on appeal, we might find maybe there's merit to it and reverse and remand for the proceedings. And had you raised it at the trial level, all of these proceedings could have been avoided because, for all we know, the trial court might have found there was merit to it as well, which is why forfeiture is a pretty sound doctrine to avoid that waste of time and energy and money by all concerns. I believe that it's a sound doctrine, and I believe that also forfeiture, waiver, however you want to call it, is also a very harsh penalty, not penalty, remedy, penalty, whatever it is, in light of these circumstances where we have duty analysis, we have a complete record of all parties being deposed. If you were to remand it to the trial court to undertake a voluntary duty analysis presumed to be restated, I would agree that it's within your discretion to do it, and I don't think this is the proper case in light of the murky waters that are before the appellate court decisions in Illinois as to the proper application and parameters and scope of in-counselor liability. Thank you, counsel. Thank you. Mr. Powell, you may proceed. Thank you. Justice Bowe, Justice Stegman, Justice Appleton, may it please the Court. Counsel. I want to start off by thanking you on behalf of Defendant Brandt and yourself for taking your time and consideration in this matter. This was fully, fully briefed. I'm quite satisfied with what was in the brief. I would be happy to answer any questions this panel has, but I would like to start off by... I take it you think Judge Harris did a nice job. Absolutely. Absolutely. Just checking. No, I've been very confident from the beginning in this case. I came in after Mrs. Liggett's case was already resolved. Another firm handled that. I was brought in then to defend Mr. Brandt once he was brought in. So, I think three of the witness depositions were already completed. I completed... I was there for my client's deposition. Then we took Mrs. Liggett's deposition because she didn't want to give her deposition before her criminal... was resolved with the drug and anti-influencer marijuana at the time of this accident that she was charged with. Does the record show what happened to that case? Your criminal case? She pled guilty. Um... The factual basis is, and justice is that you need to understand, this wasn't a dangerous route. Yes, the roads may be narrow, but it is a well-traveled road if you're familiar with this area at all. The apartment that these kids were at, you make one turn out of the apartment complex and it was a straight shot. No turns and two stop signs. So, it's not like this road was chosen to be out of the way of anything. It was literally a straight shot to Lake Wilmington. And, secondly, if you look at the facts and the deposition testimony, this wasn't a case where the kids sat around and Amanda said, now, you know, Samuel, you understand, I've only had my license for a few months and I'm not real comfortable and please go slow. It was, alright, we're going, let's go. And Amanda said, well, hey, I'm going to follow you. I'll drive too. Does somebody want to go with me? So, Brandon didn't decide who was riding with who. He said, let's go. And they separated who was going to drive with who and they left. This wasn't a full-blown discussion. But what is most important is that there was absolutely no discussion of any horseplay. No fooling around. No, let's see how fast we can get out there. Let's hurry because we only have 30 minutes to swim. None of that took place. And all of these kids have cell phones. Programmed numbers into each of their phones. And we know from the deposition testimony, at least three of those kids had cell phones with the numbers in them. Connecting the two cars. All the cases cited by the plaintiff. So you think that's a fact that addresses the notion that, gee, you had to keep up with the other car or you're not able to otherwise find out the location? No, Justice. Here's the distinction. In the cases cited by the plaintiff, with the encouragement, it was verbal. It was, hey, you just stopped abruptly back there and I almost hit you. You can't be doing that on that venture, business venture. Verbal communication is another case. Talking on CB, the town case in Washington. That was a case where they talked on the CB radio and said, hey, if we hurry up, we'll beat rush hour traffic. Keep up. And one commenter even said it was like a drag race. That is not what happened here. There is absolutely no question of fact, no evidence whatsoever that that happened. And one reason I mention cell phones, it would be different if a man of legit called a single branch vehicle and says, hey, I told you to go slow. I'm uncomfortable. Please slow down. And then he speeds up and then this happens. That's different. And then it comes into the cases that we have here. And that's what Justice Cook was so concerned about. In the right, in the Winters versus Wengler case. Look, guys, we're going to stop this before we get started. We're not expanding. That was not the intent of the legislature or the restatement, section 876. That's not the intent. We're not going there. And there's been verbiage and verbiage and verbiage in all these cases that it's not enough just to have a caravan. You've got to have something more. And I would suggest to the panel, if you're just, if you're honest, it has to be more. Forget the exact language, but in other words, it has to be more than benign. I think the court stated. What example could there possibly be if this case isn't anything more than benign? All we have is an allegation of my client speeding. Every single person in those vehicles said that they didn't think that they were speeding. That Amanda Leggett, I was never concerned for my safety. She's submissive on time. Yeah, I was a little uncomfortable on 60, but she never had any problems with maneuvering the vehicle until she hit that hill. Is it important to your case that we be able to conclude that Grant was not speeding? I don't think so. Because, again, in concert is what was their agreement to do? And that's exactly what Justice Harris put in his memorandum of decision. The only in concert action was for those kids to get to the lake house to go swimming. Absolutely no thought process whatsoever of any tortious conduct. Zero. So, what if he sped up at one time? Maybe he was talking to his buddy who went five miles over. Does he have to think, oh no, Amanda Leggett might speed up to go five miles over? I mean, that's what we're stuck with in this case. Where would this end? The plaintiff's expert in this case said, you shouldn't approach this hill but 30 to 35 miles an hour. So if Samuel Grant slows down to 45 miles an hour and she loses control, does he still have a duty under those facts? And I think that's what Justice Harris was looking at. Where does this end? Exactly the same thing with Justice Cook. Where does this end? She did not have any trouble. Grant did not have any trouble going over that hill. He didn't hit gravel and lose control. So obviously he wasn't going as fast as Amanda Leggett if that's what she did. But the most important piece of this whole puzzle is that Amanda Leggett was asked specifically by plaintiff's counsel in her deposition, what do you think the cause of this accident was? Because we were listening to Shania Twain on the radio, none of us liked her and we were laughing and joking around. I wasn't paying attention. I lost control. I overcompensated when my tail end started to swerve and I rolled it over into a b-zone. Plaintiff's attorney says, did Samuel Grant's driving have anything to do with that accident? Her answer was no, it did not. Those are the facts. There is absolutely no question factor whatsoever to have this case go to a jury. These vehicles were following each other. Was David Norman wearing a seat belt? No, he was not. And that's also in the transcripts. He had actually, I think, changed into a bathing suit in the back seat and he took it off, which is why he was exited from the car and nobody else was. But, you know, everybody stated that she was traveling approximately 50 to 100 yards behind Samuel Grant. Also, if you're honest and you can understand this, just shortly before this hill, which is the only hill out there, and if you're back far enough, you could have seen over the hill, you could see for a mile or two down there. I mean, it's literally perfectly straight. There's a stop sign just shortly before this hill. So what plaintiff wants the court to believe is that they were in tandem. 50 to 100 yards, never, Amanda never fell back, she never sped up to catch up, but everybody says Samuel Grant was not speeding. So it's irrelevant. It's irrelevant on the speed of Amanda Leggett's vehicle as it concerns my client. For this inconsiderate theory of liability, which is the only theory the plaintiff has, he pled it, he argued it, and until this appellate brief, that's all we were faced with. What about paragraphs B and C? We shouldn't address those? Your Honor, as you... They were all briefed and argued, weren't they? They were all briefed, and you know what? B and C is exactly what Justice Cook was talking about in all these other cases, and every single case is distinguishable. Yes, they were fully briefed, even though it was... I was surprised when that was abandoned in the summary judgment motion. I went there fully prepared, and I argued it for probably 20 minutes, maybe 30, and then the plaintiff's attorney gets up and says, well, we're not talking about B and C, we're talking about A. But nonetheless, under any of these theories, the plaintiff loses because everything is so distinguishable on what they're banking their case on. To allow this to go in front of a jury and go against Judge Harris's ruling would be opening all of us up for liability. If your Honors refers to trial court's decision, will any of you ever allow anyone to follow you again? Ever? Because, God forbid, I might be gawking around and increase my speed by 5 miles an hour, or if I notice that the guy following me is way back there, do I have to pull over to the side of the road to stop in fear that he might speed up and get in an accident, and then that puts me liable as well? I mean, it goes on and on and on. I got that, unless the panel has any further questions for me. I think so. I'll stand on my brief. Thank you, counsel. Mr. Schlosser, any rebuttals, sir? By the way, I apologize. Is it Schlosser or Schlosser? Depends on which side of the family you are. I would say Schlosser without the C-H, but my uncle's go with Schlosser. Okay. You know, that's after a few drinks with him. I don't know. Briefly, the plaintiff's expert did say that a prudent course of travel at the crest of this hill would be 30 to 35 miles per hour, in light of the sight lines, the obstruction, the crest of the hill, the three-foot or the narrowness of the road, three-foot less regulations. And not only did he say that, that's in the Illinois Vehicle Code. It says you have to reduce your speed below. It's no excuse to be saying you're going the speed limit with those particular types of impediments in the road. And as far as there's no evidence that Sam Brant was speeding, well, there is. I mean, there's testimony that he wasn't. I'm not going to disagree with that. There's testimony that he was, that they were keeping a constant distance in the mile to mile and a half before he reached the crest and the road, of which they were not too far behind. Duane Owens estimated she left the roadway at 70 miles an hour. The two passengers in the lead vehicle driven by Sam Brant estimated her speed to be anywhere from 75 to 90 miles an hour due to the nature of the accident they witnessed as they turned around. She even admitted she was going 60 miles an hour. Now, whether her recollection of the screen on the windshield is that good, when the accident occurred on August 7th of 2005 and she was deposed on January 8th of 2008, I don't know whether she was under the influence of marijuana or it was simply she was charged because she had trace metabolites. I don't know. But there is evidence that Sam Brant was speeding when he went over that crest. There is evidence that there was an agreement that he was going to choose the pace, choose the route, choose the participants in this caravan, and that he was speeding shortly before Amanda Lincoln left the roadway. And as far as pacing goes, and granted, it's enough to convict someone of speeding down a reasonable route in a criminal court. Obviously, there's better evidence the State's Attorney would like to see, LIDAR or radar, but that's not to suggest that pacing is not a recognized mechanism for determining speed. And I believe in this instance, and it's not going to be the sky is the limit, this is to get it before a jury. If a jury accepts all the inferences requested by Sam Brant, the likelihood they'll be finding him non-liability. If the jury accepts the reasonable inferences as proposed by the plaintiff, there's sufficient evidence to support those inferences, and there's sufficient evidence for liability in this case. So I believe it's appropriate and incumbent upon this court to return it to the trial court to have found a duty in this case and try it before a jury. Thank you. Thank you, Counsel. We'll take this matter and advise of the resource for a few moments.